Filed 10/16/13  P. v. Payne CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057365 |
| v. | (Super.Ct.No. SWF1100737) |
| SOMER PAYNE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard Todd Fields, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Somer Payne guilty of (1) forcible kidnapping (Pen. Code, § 207, subd. (a));[1] (2) maliciously or forcibly dissuading a victim or witness from reporting a crime or testifying (§ 136.1, subds. (b)&(c)); (3) making criminal threats (§ 422); (4) intentionally violating a protective order (§ 273.6, subd. (a)); and (5) three counts of domestic violence (§ 273.5, subd. (a)). As to one of the domestic violence convictions, the jury found true the allegation that defendant inflicted great bodily injury upon the victim. (§ 12022.7, subd. (e).) Defendant admitted committing one of the domestic violence crimes while released from custody in a pending case. (§ 12022.1.) Defendant also admitted suffering three prior convictions that resulted in prison terms. (§ 667.5, subd. (b).) The trial court sentenced defendant to prison for a term of 17 years, 8 months.

Defendant raises two issues on appeal. First, defendant asserts the trial court erred by admitting evidence of uncharged domestic violence incidents. (Evid. Code, § 1109.) Second, defendant contends the trial court erred by limiting her cross-examination of the victim. We affirm the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

A.    BACKGROUND AND FIRST UNCHARGED INCIDENT

In August or September 2009, when the female victim was 20 years old, she met defendant through a coworker. Defendant and the victim began a romantic relationship.

---

[1] All subsequent statutory references will be to the Penal Code unless indicated.

In December 2009 or January 2010, defendant and the victim began living together. The two lived with the victim's parents in Menifee.

In December 2009, the victim invited two of her friends and defendant to celebrate the victim's 21st birthday at a restaurant in Temecula. Defendant and the victim argued. Defendant was upset that the victim was pestering her about being punctual. Due to the argument, the victim ended the dinner early. Upon leaving the restaurant, the victim and defendant entered the victim's car. Inside the car, defendant grabbed the back of the victim's head, pushed the victim's head into the dashboard, then pushed the victim into the door, which caused the victim's head to hit the window. The victim exited the car and told defendant, "'Don't touch me. Get out of my car.'" Defendant refused, and ordered the victim to enter the car.

As the victim walked away, defendant "backed up very quickly," nearly hitting the victim. Defendant told the victim, "to get in the car," and if she did not, then her "night [would] get worse before it gets any better." The victim entered the car. Defendant drove away, running multiple red lights. When defendant and the victim arrived at a home where the victim was house-sitting, defendant told the victim that if she reported the incident, the victim would be "a rat and less of a woman," and there were consequences for being "a rat." When defendant and the victim arrived home, defendant made a telephone call, which the victim overheard. Defendant told the person on the telephone to "come immediately" and "bring rope and duct tape." The victim did not report the incident.

3

B.     COUNT 7:  APRIL 2010

In April 2010, the victim and defendant were living at defendant's parents' home in Murrieta.  On April 12, 2010, the victim told defendant she planned to meet a friend for breakfast or lunch.  Defendant told the victim she was being "disrespectful."  Defendant placed her hands around the victim's neck, and choked the victim.  The victim had difficulty breathing.  The victim decided to "take [her] stuff and go."  Defendant told the victim to stop being disrespectful and stay.  The victim refused.  Defendant spit in the victim's face.  The victim slapped defendant.  Defendant punched the victim's face.  The victim fell onto a bed.

Defendant's parents entered the bedroom where the fight was taking place.  Defendant argued with her parents, took mirrors and photographs from the wall, and threw them into the hallway.  Defendant's mother instructed the victim to go into a bathroom.  The victim entered the bathroom, but defendant followed and locked the bathroom door.  Defendant continued "screaming" at her parents through the door.  Eventually defendant opened the door.  Defendant's mother separated the victim and defendant.  Defendant's mother told the victim to leave and get medical care.

A friend came to get the victim.  The friend took the victim to the victim's mother's house.  The victim's nose continued to bleed, so she went to the doctor.  The doctor had to cauterize the injury so it would stop bleeding.  The victim sustained a broken nose.  The victim told the nurses how she was injured.  Police officers came and spoke to the victim.  The victim told the officers how she sustained her injuries.  Approximately one week later, when the officers followed-up with the victim, the

4

victim refused to cooperate with the officers. The victim decided not to cooperate because she "was afraid of harsher consequences."

### C. COUNT 6: JUNE 2010

In June 2010, defendant and the victim were living with defendant's friend in Wildomar. One day in June 2010, the victim was in the bedroom that she shared with defendant when defendant received a telephone call concerning the April 2010 statement the victim made to police about her broken nose. Defendant told the victim that the victim was "a piece of crap" and the victim "better fix this." As the victim sat on the bed, defendant kicked the right side of the victim's back, causing the victim to fall forward onto the floor. Defendant then choked, punched, and pushed the victim for approximately 20 minutes.

After the incident, the victim urinated blood for four or five days. The victim did not report the incident to police because she was scared and "there was really no opportunity." The victim was scared because she believed defendant would "do worse things to [her]." After defendant discovered the victim gave a statement to the police about the April 2010 incident, the victim had to ask defendant to eat, shower, sleep, go outside, talk to her mother, and change clothes. The victim was not allowed to speak to her friends.

### D. SECOND UNCHARGED INCIDENT

A few weeks after the June incident, defendant told the victim "she was just through with looking at [the victim], seeing [her]. So she was going to have her friends come from out of town and pick [the victim] up." Defendant said she would pay her

5

friends to keep the victim alive for one week, then "after that, it was going to be three to five grown men [and] they could do whatever they wanted with [the victim]." As defendant texted on her telephone, she told the victim she was texting her friends. Defendant said, "'They're going to be leaving in about 45 minutes. Go get in the shower.'" Defendant followed the victim into the bathroom. As the victim showered, defendant said, "'I want you to remember what the shower feels like. It's going to be the last time you take a shower. It's going to be the last time you can feel the water running down your back.'"

After the shower, the victim sat in the bedroom. When defendant left to use the restroom, the victim ran out of the house and jumped a fence that surrounded the house. The victim ran to a house approximately one block away. The victim "banged" on the door, but no one answered. Defendant arrived at the house. The victim pleaded, "'Please, please, don't hurt me. I'm sorry. I'm sorry, don't hurt me.'" Defendant said she would hurt the victim if the victim did not return to the house.

Defendant instructed the victim to change her clothes to cover the various marks and scrapes on the victim's body. The victim changed into long pants and a long-sleeved shirt. Police officers arrived at the house of defendant and the victim that night. The victim told the police nothing bad had happened.

After the June kicking incident, at a time when the victim knew defendant would be away from the house, the victim sought medical care. The victim told medical staff that she fell off a ladder.

E.     THIRD UNCHARGED INCIDENT

In February 2011, defendant and the victim were living with one of defendant's friends in Lake Elsinore.  One day in February 2011, defendant asked the victim to get a sandwich for defendant.  The victim went to a restaurant to get a sandwich.  While the victim was getting the sandwich, defendant texted the victim asking why the victim was taking so long.  The victim explained the restaurant was busy.

When the victim arrived home, she was "so worried about hurrying up" that she locked the keys in the car.  The victim texted defendant, "'I'm here, but I locked the keys in the car.  Please don't be upset with me.'"  The victim pleaded with defendant to not hurt her.  Defendant instructed the victim to "'[g]et in the house.'"

When the victim entered the home, defendant grabbed the victim's collar and moved her into a bathroom.  Defendant punched the victim's face.  Defendant "berated" the victim.  Defendant accused the victim of cheating on her because it could not take a person such a long time to purchase a sandwich.

F.     COUNTS 1, 2, AND 3:  FEBRUARY 2011

The following day, the victim had a bruise on her face.  The victim covered the bruise with make-up and went to work.  The victim forgot her wallet at home.  A coworker noticed the victim did not have food and offered to share her lunch.  The victim accepted.  Defendant called the victim, and the victim said she was eating.  Defendant asked how the victim was eating if she forgot her wallet.  The victim explained a coworker gave her lunch.  Defendant accused the victim of making

7

defendant "look like a bad partner" because it could appear defendant did not provide the victim with lunch. Defendant also accused the victim of cheating on her.

The victim told defendant she "shouldn't have to be afraid of coming home." The victim said that if defendant "couldn't promise [the victim] that [she] was going to be able to come home and be safe, [then the victim] was not going to come home." In response, defendant said she would come to the victim's work and "cause a scene" if the victim did not promise to return home. The victim refused to go home. The voice conversation ended at that point, but the two continued communicating via text message. Defendant wrote she was on her way to the victim's place of employment and she would cause the victim to lose her job.

Defendant arrived at the victim's place of work and walked toward the victim's desk. Defendant told the victim she wanted to speak with her. The victim refused. Defendant threatened to cause a scene if the victim did not speak with defendant outside. The victim went outside with defendant. Defendant apologized to the victim and asked the victim to come home with her, but the victim refused. The victim's manager went outside and asked defendant to leave, so the victim could return to work. Defendant said, "'I'm her girlfriend, and I'm not going to leave.'" The manager said he would give defendant and the victim two more minutes, and he went inside the store.

Defendant told the victim she wanted to speak to the victim in her truck, so the victim's coworkers would not call the police. Defendant guided the victim toward the truck. The victim entered the driver's side of defendant's truck, in order to have more

8

control over the vehicle. After defendant stood "there for a moment," the victim slid over to the passenger seat, and defendant sat in the driver's seat.

Defendant continued asking the victim to leave with her, but the victim refused. Eventually, the victim said she was going back inside in the store. At that point, defendant started the truck and "floored it." The victim reached for the door handle, in order to jump from the truck, but defendant held the victim in the truck by grabbing her hair. Defendant punched the victim more than 10 times along the left side of her body.

Defendant drove on Interstate 215, asking the victim if she thought defendant would allow the victim "to just leave her like that." Defendant told the victim, "'Now they're going to call the police,'" and "if [defendant] was going to get in trouble for anything, that she might as well get in trouble for killing [the victim]." Defendant said she and her friends would take the victim to the desert, put her in a bag, and light her on fire, so no one could find her.

Defendant drove the victim to defendant's friend's house in Wildomar. Defendant instructed the victim to stay in the truck. Defendant said if the victim "attempted to run or leave [then the victim] wouldn't make it to the end of the driveway." After a few moments, defendant instructed the victim to go in the house. Defendant told the victim "to pretend like everything was fine" when the police called.

The police called defendant's telephone. The victim answered and spoke to the officer on speakerphone, while defendant was next to the victim. The victim told the officer she was fine and did not have time to talk. A few hours later, police arrived at

the friend's house. Defendant and the victim were taken to the police station. The victim lied to the police about the events of the day.

At some point, the victim received a telephone call from one of defendant's friends. The friend told the victim it was the victim's responsibility to bail defendant out of jail, and defendant owed the friend a debt that would "fall upon" the victim if defendant stayed in jail "and that there . . . would be repercussions if [the victim] didn't follow through." The victim bailed defendant out of jail. Due to defendant's instruction, the victim requested the trial court change the protective order from no contact to no negative contact. Defendant and the victim resumed living together.

Three or four days after the argument at the victim's place of work, defendant called the victim's work 46 times, which resulted in the victim's employer calling the police. Defendant then went to the victim's work and demanded the keys to the victim's car. Defendant felt she was owed the victim's car because defendant's car was impounded after the previous argument at the victim's place of work. The victim gave defendant her car keys because she was afraid of defendant.

G.     COUNTS 4 AND 5:  MAY 2011

Defendant and the victim were living together in Lake Elsinore in May 2011. On May 17, 2011, defendant accused the victim of locking defendant out of portions of a computer. The victim denied the accusation. Defendant and the victim argued. Defendant punched the victim's face. As a result, the victim suffered a cut on her lip. Defendant berated the victim—telling her she was "a piece of crap," "less of a woman," and "stupid."

10

A few days later, on May 21 or 22, while at work, the victim called her parents and asked them to pick her up and take her as "far away as possible." The victim's parents and a sheriff's deputy took the victim from her job to her parents' house. At the beginning of June, the victim changed the protective order to a no contact order. The victim moved to a location outside the state.

In June, after the no contact order was issued, defendant contacted the victim via telephone. During the telephone conversation, defendant asked the victim if she "understood the possible amount of time that [defendant] was facing for this case." Defendant told the victim to "fix it." The victim told defendant it was not the victim's problem and hung up the telephone. Defendant called the victim again. Defendant told the victim "to fix it and make it go away for her." Defendant also told the victim "to make sure that [the victim] was very aware of [her] surroundings in court."

G.      MOTION TO ADMIT EVIDENCE

In the People's trial brief, the prosecutor asserted two incidents of uncharged domestic violence should be admitted pursuant to Evidence Code section 1109: (1) the December 2009 incident during the victim's birthday celebration when defendant slammed the victim's head into the dashboard, and (2) the February 2011 incident in which the victim locked her keys in the car and defendant punched the victim's face. The prosecutor asserted evidence of the two uncharged acts would help establish "a pattern of anger management problems and abusing the victim," thus reflecting defendant's propensity for violence.

11

At a hearing on the motion, the trial court stated it was inclined to allow the prosecution to present the evidence because the two incidents were not more inflammatory than the charged conduct. The trial court explained that the charged conduct was more serious because it involved kicking to the extent of causing blood in the victim's urine, kidnapping, and threats to kill. The trial court also found the uncharged conduct was not remote in time.

Defense counsel asserted the evidence of uncharged acts would be "very inflammatory" because there was "nothing to substantiate it," so it was "very, very prejudicial hearsay evidence." Counsel clarified that there was nothing to corroborate the victim's testimony. The trial court said it would be the jury's job to determine if it believed the victim, and then explained evidence of uncharged acts always involved some level of prejudice, but the issue was whether the probative value was substantially outweighed by the prejudice. The trial court said, "And I don't see that nearly as inflammatory as the things that are changed in this particular case, forcible kidnapping, threats to kill, broken nose. I just don't see it as inflammatory."

Defense counsel asserted there were already seven charges, so evidence of the uncharged crimes would be "cumulative and overkill." The trial court stated it did not believe two uncharged incidents constituted overkill. The trial court granted the prosecutor's motion.

**DISCUSSION**

A.     EVIDENCE OF UNCHARGED ACTS

Defendant contends the trial court erred by admitting evidence of uncharged acts of domestic violence because (1) the evidence was inflammatory, (2) the evidence was cumulative, and (3) the 2009 incident involved stronger evidence than the charged acts. We disagree.

1.     *INFLAMMATORY NATURE OF THE EVIDENCE*

Evidence of uncharged acts of domestic violence is admissible to show a defendant's propensity to commit domestic violence.  (Evid. Code, § 1109, subd. (a)(1); *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233.)  Although evidence may be admissible under Evidence Code section 1109, a "trial court must still determine, pursuant to [Evidence Code] section 352, whether the probative value of the evidence is substantially outweighed by" the prejudicial effect of the evidence.  (*Brown*, at p. 1233.) "Relevant factors in determining prejudice include whether the prior acts of domestic violence were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, how recent were the prior acts, and whether the defendant had already been convicted and punished for the prior offense(s). [Citations.]"  (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

"The [trial] court enjoys broad discretion in making this determination, and the court's exercise of discretion will not be disturbed on appeal except upon a showing that it was exercised in an arbitrary, capricious or patently absurd manner that resulted in a

manifest miscarriage of justice. [Citations.]" (*People v. Brown*, *supra*, 192 Cal.App.4th at p. 1233.)

We address the comparative inflammatory nature of the 2009 incident. During the 2009 incident, defendant slammed the victim's head into a dashboard and car window, berated the victim, nearly ran over the victim, and mentioned rope and duct tape during a telephone conversation. The trial court could reasonably conclude the evidence concerning this incident was not more inflammatory than the charged offenses, because the charged incidents involved (1) a broken nose, (2) a forcible kidnapping, and (3) repeated punches and strikes. In the 2009 incident, defendant attempted to run over the victim, but did not touch the victim with the car. The charged incidents involve actual contact and injuries, not attempts. Additionally, the duct tape and rope telephone conversation was not directed at the victim, whereas the charged threat for the February 2011 incident involved a direct threat against the victim, e.g., defendant said she would set the victim on fire in the desert. When comparing the charged and uncharged crimes, the threat made during the 2009 incident is not more inflammatory than the charged threat made during the February 2011 incident, given the direct and explicit nature of the 2011 threat. Thus, the trial court could reasonably find the 2009 incident was not more inflammatory than the charged incidents.

The February 2011 incident involved a punch to the victim's face when the victim locked her keys in the car. The charged offenses involved multiple strikes to the victim's body in a single incident, and strikes that resulted in injuries, such as a broken nose and urinating blood for multiple days. The trial court could reasonably conclude

14

the evidence of a single punch was not more inflammatory than the charged crimes, given the more serious nature of the charged acts.

Defendant contends the trial court erred because in addition to the 2009 and February 2011 incidents, the trial court permitted the prosecution to present evidence of defendant's uncharged act of threatening the victim with "a last shower" after the June 2010 offense. While the shower threat could be viewed as a harsh uncharged act, the question is whether it is *more* inflammatory than the charged acts. (*People v. Williams* (2008) 159 Cal.App.4th 141, 147 ["more inflammatory"].) The charged threat involved directly telling the victim that defendant and/or her friends would set the victim on fire in the desert. The shower statements concerned an implied threat of gang rape and death. Given the charged act involved a direct threat, while the uncharged act concerned an implied threat, the trial court could reasonably conclude the uncharged threat was not more inflammatory than the charged threat.

### 2.      *CUMULATIVE EVIDENCE*

We now address defendant's contention concerning the uncharged act evidence being cumulative. There is not a "bright-line test" for whether evidence is cumulative. Determining whether evidence is cumulative involves considering whether "the volume of evidence extend[s] the trial 'beyond reasonable limits.'" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1139.)

The evidence of the 2009 incident helped to explain when defendant's and the victim's relationship first became violent. Thus, the 2009 evidence gave the jury context within which to place the charged incidents. As a result, the trial court could

reasonably conclude the 2009 evidence was not cumulative because it was not repetitive of other issues and helped the trier of fact to better understand the charged acts.

The evidence of the uncharged 2011 punch helped the jury understand the kidnapping incident that occurred the following day.  For example, the victim was punched for leaving her keys in the car, and the following day she argued with defendant about wanting "to come home and be safe."  The fact that the uncharged punch took place the day before this conversation helped the jury understand exactly what sparked the argument that led to the kidnapping.  Accordingly, the trial court could reasonably conclude the 2011 punch evidence was not cumulative because it helped the jury to better understand the charged kidnapping and related offenses.

The evidence of the 2011 implied shower threat helped explain what happened after the incident in which defendant kicked the victim so hard that the victim urinated blood for multiple days.  The implied shower threat spurred the victim to try to escape from defendant, in that the victim ran to a neighbor's house following the implied threat.  This evidence showed that the continuing pattern of the victim trying to leave defendant following a particularly brutal incident only to return a short time later.  Here, the shower threat evidence was needed to show what finally caused the victim to try to leave defendant after the kicking incident.  Thus, the trial court could reasonably conclude the evidence was not cumulative.

3.  *STRENGTH OF THE EVIDENCE*

Defendant contends the prejudicial effect of the uncharged act evidence was "heightened" by the fact that the uncharged acts were supported by stronger evidence

16

than the charged acts. For example, the victim and the victim's two friends testified about the 2009 birthday/dashboard incident, thus providing corroborating testimony about the uncharged 2009 incident. We have explained *ante*, that the trial court could reasonably conclude the uncharged act evidence was not (1) more inflammatory than the charged acts, and (2) cumulative. The fact that there was corroborating testimonies for the 2009 incident does not cause us to change our position on these conclusions.

We note that defendant's argument is similar to an argument for a motion to sever counts. For example, counts may be severed if a weak case has been joined with a strong case in order to unfairly alter the outcome on the weaker counts. (*People v. Scott* (2011) 52 Cal.4th 452, 470.) To the extent defendant is asserting the 2009 incident should have been "severed" because it was supported by stronger evidence, we find such an argument to be unpersuasive. The victim's first friend testified that all she saw inside defendant's car was "a motion," so she did not know if the victim's head was slammed into the dashboard; the victim's second friend testified that she saw defendant "reach back," but she did know if defendant "made contact" with the victim. Accordingly, while there was some corroborating evidence for the 2009 incident, it was not overwhelming because the friends were unsure of exactly what they witnessed. As a result, the trial court acted reasonably in not "severing" the 2009 incident.

B. CROSS-EXAMINATION

1 *PROCEDURAL HISTORY*

The following questions and answers occurred during the cross-examination of the victim:

17

"[Defense Counsel]:  Now, you have been in I guess—was this your first committed relationship?

"[The Victim]:  No.

"[Defense Counsel]:  So prior to you meeting [defendant] you had been in other I guess long-term or committed relationships?

"[The Victim]:  That's correct.

"[Defense Counsel]:  Okay.  And had you ever been cheated on before?

"[Prosecutor]:  Objection.  Relevance.

"The Court:  Sustained.  And 352."

As the cross-examination continued, the victim explained that when she and defendant were living with the victim's parents, defendant and the victim "were picking up the pieces" after the victim discovered defendant had been living with her ex-girlfriend (Nicole).  The victim explained she did not like defendant speaking to Nicole because defendant "cheated on" the victim with Nicole.  The following exchange ensued:

"[Defense Counsel]:  But you later found out that even when you were still living together she was still having ties or communications or was seeing Nicole; correct?

"[The Victim]:  Yes.

"[Defense Counsel]:  That's what started the argument?

"[The Victim]:  Yes.  I felt that was a little insensitive, and I had specifically asked her to allow me just a little while before she was friends with the individual again.

18

"[Defense Counsel]: Okay. So you didn't even want her to be friends with Nicole?

"[Prosecutor]: Objection. Relevance.

"The Court: Sustained. Evidence Code [section] 352 also.

"[Defense Counsel]: Was it your idea to move in with your parents?

"[The Victim]: Yes.

"[Defense Counsel]: And when you brought this up to [defendant], what did she say about that idea?

"[Prosecutor]: Objection. Relevance.

"The Court: Sustained."

The victim explained that, after some time apart due to the Nicole situation, defendant invited the victim to live with defendant at defendant's parents' house. The following exchange took place:

"[Defense Counsel]: Then you agreed to go live with her at her parents' house knowing that she still had ties or communications with Nicole?

"[The Victim]: Yes.

"[Defense Counsel]: That's the time you told her that you agreed to be the other woman?

"[The Victim]: I never agreed to be the other woman.

"[Defense Counsel]: Do you remember talking about that?

"[Prosecutor]: Objection. Relevance.

"The Court: Sustained.

19

"[The Victim]:  I just—

"The Court:  No.  I sustained the objection.

"[The Victim]:  Sorry.

"[Defense Counsel]:  So you never agreed to be the other woman?

"[Prosecutor]:  Objection—

"The Court:  I just sustained the objection.  Don't ask the same question, please. And 352."

At a sidebar conference following the foregoing exchange, the trial court made the following comments:  "[Defense counsel], I'm sustaining that objection.  I know that you are asking questions to show if she has a bias.  I've given great leeway to allow you to ask did you have an argument?  Did you start it?  Was she seeing someone else? Did that upset you?  Because those things tend to show that maybe she has motive to lie. But start talking about third party relationships and the other woman, and I—I think that the probative value is substantially outweighed by the undue consumption of time.

"You have spent a substantial amount of time, and we really haven't discussed anything related to the actual charges at all.  Whether something tends to prove or disprove a charge as far as—because much of this is really extraneous, but it's very relevant to the fact of if they had arguments, the fact that the complaining witness may have been upset with the defendant so that would give her a reason to lie potentially.  I have allowed those questions.  I have overruled objections on that.

"But I think we're . . . getting really far afield, and we need to move on because I've allowed you to ask the questions about the fact that they argued, that she was upset

20

and the fact that—she said it really three times.  The People objected.  But it was cross.  I allowed it.  She said she was disappointed.  You asked her another time and another time.  [¶]  So at this point I think you need to move on."

Defense counsel said he planned to move on with his examination and question the victim about "the next area."  The trial court said, "I just felt like if we were going to stay in that area about this third party—you had asked a question about the complaining witness's prior relationship.  I didn't see the relevance.  I could see a lot of things that didn't seem to the Court to tend to prove or disprove any disputed issue in question here.  So that's why I was waiting to see.  [¶]  If you're saying you're moving on, I think we're fine."

### 2.  *DISCUSSION*

Defendant contends the trial court erred by sustaining the objections set forth *ante*, because the court "prevented [defendant] from conducting a meaningful cross-examination of the alleged victim."  For example, defendant asserts evidence pertaining to the victim's reactions to defendant's infidelity could have shown the victim was biased against defendant or had a reason to retaliate against defendant.  Defendant's arguments are focused upon Evidence Code sections 352 and 780, as opposed to a constitutional right to present a defense.  As a result, we focus our discussion on defendant's evidentiary concerns.[2]

---

[2] Defendant mentions her constitutional rights to confront and cross-examine witnesses in her harmless error argument; however, the constitutional issues do not form the substance of his assertion of error.

21

Evidence Code section 780, subdivision (f), allows a jury to consider the existence of a witness's "bias, interest, or other motive" for testifying untruthfully. Evidence Code section 352 authorizes a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  A trial court's Evidence Code section 352 ruling is reviewed for an abuse of discretion.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)

The trial court permitted the victim to answer questions concerning her feelings toward defendant after she learned of defendant's relationship with Nicole.  The victim said she felt distrustful of defendant, "disappointed," "hurt," and "didn't appreciate" defendant's infidelity.  The trial court excluded testimony about (1) the victim ever having been "cheated on" in a different relationship; (2) whether the victim wanted defendant to stop being friends with Nicole; (3) defendant's comments about the victim wanting to live with the victim's parents; and (4) whether the victim agreed to be the "other woman" in defendant's relationship with Nicole.

The record reflects the trial court permitted defendant to elicit testimony that reflected a possible bias or motive on the part of the victim, i.e., her hurt feelings about defendant's infidelity.  The evidence the trial court excluded concerned extraneous matters, such as the victim's previous romantic relationship(s) and conversations about possibly moving residences.  None of the questions the trial court excluded would have provided further insight into the victim's possible reasons for testifying dishonestly.

22

For example, the pertinent issue was not whether the victim wanted defendant to stop being friends with Nicole, the issue was how the victim felt about defendant's relationship with Nicole, and the trial court allowed the evidence about the victim's feelings to be presented because that helped to show the victim's state of mind and possible bias. In sum, we conclude the trial court did not err because it permitted defendant to question the victim about her possible bias.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                                    J.

We concur:

McKINSTER
        Acting P. J.

RICHLI
                J.

23